**PATTERSON STEEL COMPANY,
Petitioner,**

v.

**Charles Edward PHILLIPS and State In-
dustrial Court, Respondents.**

**No. 42498.**

Supreme Court of Oklahoma.

Nov. 19, 1968.

Downing & Smith, Dennis J. Downing, Jean Charles Smith, Tulsa, for petitioner.

Elmore A. Page, Tulsa, for respondent.

LAVENDER, Justice.

Charles Edward Phillips filed a claim against Patterson Steel Company for com-

pensation under the Workmen's Compensation statutes of this state in connection with a "Back injury resulting in major back surgery" caused by "Falling off a ladder approximately 10′ high" on September 19, 1966, while employed by Patterson Steel Company (hereinafter called the "employer") as a welder's helper, claiming "Partially permanent" "Loss of use of a member" which was not specified.

The employer filed an answer consisting of (1) a general denial, (2) specific denial that the claimant sustained an accidental injury arising out of or in the course of his employment, and (3) an allegation that any disability to the claimant, either temporary or permanent, is the result of claimant's failure to accept an examination or treatment by a doctor selected by the employer, and that the claimant's willful refusal to accept such examination or treatment has resulted in prejudice to the respondent.

At the opening of the hearing before the trial judge on the matters of medical expenses and temporary total disability, it was stipulated that the claimant was in the employ of Patterson Steel Company on September 19, 1966; that the nature of his work was hazardous within the purview of the Workmen's Compensation statutes; that his wage scale of wages was sufficient to entitle him to the maximum compensation of $40.00 per week if entitled to compensation.

Claimant testified that on the morning of September 19, 1966, while he was in a crouching position on the ground using two pipe wrenches to tighten connections on some oxygen lines that were being installed in the employer's plant, one of the wrenches slipped off the pipe and he fell over backwards on some small pipe that was laying there and twisted his back; that he went to the first-aid room and told the lady there what had happened; that that was about eleven or eleven-thirty, and she told him to come back after lunch if he didn't feel better by then; that he went back about one o'clock and she used a heat lamp on the small of his back for a while and then told him to go back to work and do as much as he could and to rest that evening with a heat pad at his back; that he worked that afternoon, using a rivet gun; that he couldn't sleep well that night because of pain in his lower back and leg, so the next morning (the 20th), went to the G–N Clinic in Tulsa because that was where he had been sent for a pre-employment physical examination; that, at that clinic, he told Dr. S. what had happened and what his symptoms were; that Dr. S. made x-ray pictures of his back, put some medication on his back, gave him a muscle relaxant and some medication for pain, and told him to come back to the clinic if he didn't improve; and that he did not go back to the clinic.

Claimant also testified that after he got home from the clinic, he took some of both medications given him by Dr. S. but kept feeling worse, so during the afternoon (of the 20th), his wife phoned Dr. McC. and he told her to bring the claimant to the emergency room at the Oklahoma Osteopathic Hospital (in Tulsa); there, he told a man whom he understood was an intern what had happened and his symptoms, and they took x-ray pictures, put him in a room and in traction; that the following day (the 21st), just after lunch, they ran a myelogram on him and then put him back in traction. He admitted that later that same afternoon he received a phone call from an attorney for the employer who told him that if he had any medical problems, the company would furnish a doctor, Dr. G., and advised the claimant that he (the attorney) would advise hospital admittance for the purpose of examination and treatment if Dr. G. deemed that necessary; that about ten minutes later the attorney called him back and said that he had arranged for a bed for him in St. John's Hospital (in Tulsa) and for an ambulance to come and take him there; that he, the claimant, told the attorney that he thought he was all right where he was and wouldn't accept the offer; and that about 3:55 the same afternoon (the 21st), he received a

telegram from the attorney for the employer, which was admitted in evidence without objection, and which stated:

"This will confirm our two fone calls with this date 245 and 305 PM wherein we advised you that arrangements had been made and we agreed to pay your medical expenses under the care of (Dr. G) MD. We arranged for your admission to the St. John's Hospital immediately and agreed to furnish an ambulance to transport you there we urged you to accept this treatment but you refused. You were advised, and by this wire you are again advised, that Patterson Steel Company will not be responsible for any medical expenses incurred by you or any disability suffered, unless you are first examined and given an opportunity for treatment by a doctor for their choosing. Patterson Steel Company still stands ready to furnish you this treatment by Dr. (G) at this time."

Claimant further testified that he had been given shots in his back when they ran the myelogram and another one when he got back to his room to put him to sleep, and part of the fluid used for the myelogram was still in him and he was sick at the time of the phone calls from the employer's attorney; that Dr. McC. came in later and told him that he had a ruptured disc and said that it wasn't advisable for him to be moved at the time for his own health; that on the following day (the 22nd) they prepared him for an operation, and on the day after that (September 23rd) performed an operation on his back; that he was in the hospital 29 days, under the care of Dr. McC. and his associate, Dr. W., who was present during the operation; that he had been reporting to them every four weeks since leaving the hospital, for shots in his lower back and his right leg still bothered him; and that he had not yet been released by either of them to return to work.

The testimony of the lady in charge of the first-aid room at the plant, concerning the claimant's visits there on the 19th, was substantially the same as the claimant's testimony concerning those visits, except that she testified that she told the claimant, as was the usual practice, to report to the G-N Clinic if he didn't improve.

A written report by Dr. S. to the employer, under date of September 23, 1966, concerning the claimant's visit to that clinic was received in evidence without objection. It reads as follows:

"This patient was first seen in this Clinic on the morning of September 20, 1966, stating that on the previous day he was tightening an oxygen line with a wrench in a bent position and the wrench slipped and in some way, he pulled his lower back and an area between his shoulders.

"Examination here revealed that this patient had slight tenderness to pressure over the mid lumbar spine and stated he was somewhat sore in the thoracic and cervical spine area. There seemed to be very slight spasm in the lumbar area although the patient was able to bend down to the floor adequately.

"X-rays were obtained and reported as follows: Lumbar spine There is no X-ray evidence of old or recent fracture or dislocation. Wedging of the left half of the body of L–3 is demonstrated with slight degree right-sided curvature centered at this level. The lumbar spine is not otherwise remarkable.

"This patient was prescribed with medication for pain, one of the muscle relaxants and told to report for daily physical therapy. Based upon this one examination of this patient, it was my impression that this patient had a mild lumbar strain and if light duty were available at Patterson Steel, he probably would be able to continue working. This patient did not return to this clinic for follow up care."

A form of report and statement of charges, rendered by Dr. S. to the employer under

date of October 7, 1966, concerning this patient, was received in evidence without objection, and shows the following information:

"Date of Accident: 9–20–66

History of Injury: Was tightening an oxygen line with a wrench in a bent position. The wrench slipped and he injured the lower back and area between his shoulders.

Diagnosis: Sprain, lumbar area.

Date First Seen: 9–20–66 Date of Last Visit: Did not return.

Treatment Rendered: X-rays obtained; daily medcosonic treatments recommended. Given RX for medication.

X-ray Report: Lumbar spine, negative for recent fracture or dislocation.

Time Lost: None known. Permanent Disability: None."

———◆———

A written report by Dr. McC. to the then-attorney for the claimant, dated November 30, 1966, also was received in evidence without objection. It stated:

"Charles Phillips was first seen as a patient under our service in the emergency room of Oklahoma Osteopathic Hospital on 9–20–66. At the time he was first seen he stated that he had severe low back pain with radiation into the lower right extremity and complaints referable to the cervical spine. He stated that while working on 9–1–66, he fell from a ladder 10 feet in the air while working on an oxygen line and landed flat on his back. This was prior to his lunch hour. He went to lunch and went to the dispensary following lunch but was unable to continue his day's work. Upon arising on the morning of 9–20–66, he experienced pain in the lower right extremity and was examined at [G–N] Clinic and given medication. He was seen in the afternoon in the emergency room experiencing severe pain. It was difficult at that time to carry out a full evaluation due to the patient's distress. It was noted, however, that the patient leaned toward one side in the erect position with the patient unable to stand in a straight position with a positive right Lasegue's sign as well as decreased achilles reflex on the right.

"The patient was admitted to the hospital and placed in traction. He was given medication for his pain. In the AM of the following morning, the patient was taken to the Department of Radiology at which time a lumbar myelogram was carried out. The myelogram was negative for filling defect but it was noted that the spinal fluid which had been sent to the laboratory was 65 mg percent which was suggestive of disc pathology. Further treatment was carried out in that the patient was maintained in traction and given medication which included Morphine Sulphate as much as a grain ¼ to relieve his pain. On 9–22–66, the patient was re-evaluated and the persistence of the decreased achilles reflex as well as the pain in the lower right extremity resulted in the patient being advised to have surgical correction the next day.

"On 9–23–66, the patient was taken to surgery at which time there was demonstrated a posterolateral protrusion of the nucleus pulposus of the 5th interspace on the right. There was noted marked evidence of instability and tearing of the periarticular structures. Lumbar laminectomy at L–5 with excision of nucleus-pulposus at L–5 with a bilateral screw arthrodesis at L–5 and L–4 and interspinous Boplant fusion between L–4/L–5 was carried out. The patient was returned to his room in satisfactory post-operative condition and was treated at Okla-

homa Osteopathic Hospital until time of his discharge on 10–14–66, at which time he was instructed to return to our office for further post-operative care. The patient is under our care at the present time and will remain so for approximately six months. His progress to this date has been satisfactory and the patient has been relieved completely of his pain in the lower right extremity and low back region and there has been no progressive weakness of the right extremity as the result of removing the pressure from against the nerve root.

"If there are any further questions concerning this patient, do not hesitate to contact me."

Dr. R., an orthopedic surgeon, with more than twenty years of practice in orthopedics and whose qualifications as an expert in the field were admitted by claimant's counsel, testified that he had had two patients with a diagnosis of a ruptured disc transported to his care from as far away as South America—one from Columbia and the other from Venezuela—without suffering any recognizable adverse effect from the move; that in his medical opinion a move, by ambulance, from the Osteopathic Hospital in Tulsa to St. John's Hospital in Tulsa, would not endanger the health of a patient with a diagnosis of a ruptured disc, either before undergoing a myelogram or some three or four hours after undergoing a myelogram. And, in answer to hypothetical questions based upon this claimant's testimony as to the incident in question, the testimony of the lady in charge of the company's first-aid room concerning what occurred during the claimant's visits there, the reports of Dr. S. concerning his examination of the claimant at the G–N Clinic and the results thereof, and the report of Dr. McC., of November 30, 1966, and the records of the Oklahoma Osteopathic Hospital, concerning the examination and treatment of the claimant in that hospital prior to, but not including, the operation performed on him, but omitting any reference to a fall from a ladder, Dr. R. testified that he had heard nothing which would indicate a need for surgery. Then, when asked about his treatment of patients having similar or comparable symptoms, Dr. R. stated: "Well, this must be highly individualized, but the vast majority of patients with back pain are not operated. When the evidence is conclusive there is nerve root pressure it may be a foregone conclusion that most of those will require surgery but not even all of those will. We usually exercise a period of observation under conservative measures before arriving at a conclusion, unless it is supported by very definite objective evidence of nerve root [pressure]."

On cross examination, Dr. R. testified that headaches and pain in the cervical area of the back (about which the plaintiff had testified) were not consistent with a disc pathology in the lower lumbar area; and, when asked if the statements made in the second paragraph of the November 30, 1966, report of Dr. McC. (which were read to him) would change his testimony with respect to whether or not the person involved could have been moved after that myelogram and with respect to whether or not he should have been operated, Dr. R. answered: "Yes sir. I will answer the last part of your two-point question first and state that if the patient actually had a loss of a reflex, it would change the opinion to the effect that it might be stated that he very likely would have required ultimate surgery. Now as regards the first part of the two-point question—whether or not it was an emergency, or whether or not he could be moved —my answer to that is that it need not be considered an emergency, and that it would be possible to move him without any deleterious effect to the patient."

Because of this testimony by Dr. R., claimant's counsel asked to be allowed to take and introduce in evidence the deposition of Dr. McC. (who, he stated, was out of town that day to perform emergency surgery), and the employer's counsel suggested the filing of a supplemental report of Dr. McC., covering the matters in question. Clearly indicating that he thought that, un-

der the law, more than the matter of emergency treatment by some one other than a doctor chosen by the employer and the matter of the necessity of the operation performed by Dr. McC., were involved in the employer's third defense to this claimant's claim, so that it might be possible for the claimant to be entitled to disability compensation even though he might not be entitled to medical and hospital expenses incurred by him (and calling for briefs by both parties on that question), the trial court—because claimant's counsel at the hearing had entered the case only a few days before the hearing—directed claimant's counsel to obtain a supplemental report from Dr. McC. and show it to the employer's counsel, and gave counsel for the employer five days after the report be filed with the trial judge within which to inform the trial judge whether he wished to cross-examine the doctor by deposition. Two days later, a report by Dr. McC. addressed to counsel for the claimant, was filed with the State Industrial Court. That report stated:

"To supplement my report of November 30, 1966, I will attempt to clarify this patient's need for emergency surgery.

"This patient was admitted to Oklahoma Osteopathic Hospital on an emergency basis and it was necessary to give him heavy sedation in order to attempt examination. Myelographic examination performed on this patient the following day was interpreted by the Department of Radiology as negative, however, all clinical findings were positive for a herniated disc as well as the spinal fluid showing a 65 mg. per cent. This patient was in such acute pain that he was unable to tolerate traction and the pain continued and became such that it was necessary to give him larger amounts of Morphine in order for him to stand the pain.

"Certainly, the diagnosis of a herniated disc was substantiated at surgery at which time it was clearly demonstrated that this patient had a large posteriolateral protrusion of the nucleus pulposus at the 5th lumbar interspace on the right.

"If further information is needed, please do not hesitate to request."

On the day following the filing of that report, the trial judge entered an order in the matter finding, first, that the claimant sustained an accidental personal injury, arising out of and in the course of his hazardous employment with the respondent, within the terms and meaning of the Workmen's Compensation Law, on September 19, 1966, consisting of an injury to his back; and, next, that the respondent is not liable for any medical expense incurred by the claimant through Dr. McC. or Dr. W. or hospitalization expense at the Oklahoma Osteopathic Hospital; and, lastly, that at the time of such injury, the claimant's wages were sufficient to fix his rate of compensation at $40.00 per week, and as a result of said injury, the claimant has been temporarily totally disabled from September 20 to March 14, 1967, and is still temporarily totally disabled and in need of further medical treatment, care, and attention, and is entitled to compensation for temporary total disability at the rate of $40.00 per week in the amount of $1,000.00 accrued for the 25 weeks from September 20, 1966, to March 14, 1967, and to continue during claimant's period of temporary total disability, not to exceed 300 weeks, or until further order of the court, and also is entitled to be furnished such medical attention as may be necessary for correction of his condition due to such injury, at the hands of a competent physician to be selected by the respondent or its insurance carrier. The order to the employer is in accordance with the last finding.

On appeal by both parties, the State Industrial Court, en banc, affirmed the order of the trial judge, and the employer filed this original proceeding to review the last-mentioned order.

The employer's basic theory of the case seems to be that the claimant's disability, if any, is the result of unnecessary surgery on his back rather than the result of injury to his back, sustained in the fall described by him, and that since the claimant refused

the medical treatment and services tendered by the employer and obtained the treatment and services from others of his own choosing, the employer is not liable for any compensation for such disability, unless the surgery was of an emergency nature.

Two of the employer's three propositions —its second and third propositions—involve this theory of the case.

Its second proposition is that because the award of compensation for temporary total disability could be upheld only upon the basis that the surgery was of an emergency nature and the ex-parte supplemental statement of Dr. McC., which was admitted in evidence without stipulation or waiver by the employer and without compliance with the trial judge's directions with respect thereto, was the only evidence on that point, the award was based on inadmissible evidence and, therefore, must be vacated [citing Wilkerson Chevrolet, Inc. et al. v. Mackey et al. (1964), Okl., 396 P.2d 664, 669].

The employer's third proposition is that the State Industrial Court made no specific findings of the ultimate facts concerning the issues raised by the third defense set forth in the employer's answer to the claim (which is based upon the above-mentioned theory of the case), and, therefore, the award must be vacated [citing Young v. City of Holdenville et al. (1963), Okl., 384 P.2d 905].

■ Spartan Aircraft Co. v. Merchant et al. (1954), Okl., 274 P.2d 1018, involved a similar fact situation and the employer therein, without mentioning the matter of the emergency, or non-emergency, nature of the surgery involved, contended that the claimant had not sustained an injured disc in the incident involved and any disability the claimant might have was not caused by the incident but by an unnecessary operation, and, therefore, the employer was not liable for compensation for such disability. In answering that contention, this court said in the Opinion:

"This contention would be correct if the evidence had conclusively established that the refusal of respondent [claimant] to continue treatment offered by the physician selected by petitioner [employer] was arbitrary and unreasonable, that the operation was unnecessary and the disability he now has was due to the unnecessary operation. Consolidated Lead & Zinc Co. v. State Industrial Commission, 147 Okl. 83, 295 P. 210, 73 A.L.R. 1298; Chicago Bridge & Iron Works v. Sabin, 105 Okl. 62, 231 P. 851.

"We do not however agree that the evidence conclusively shows such state of facts. The medical evidence is in conflict as to the cause and extent of respondent's disability."

In sustaining the award in that case, this court held that the evidence was sufficient to sustain the finding and award of the Commission, and (in the first paragraph of its syllabus) that:

"The question of whether an injury arose out of and in the course of employment is one of fact to be determined by the Industrial Commission [now court] under the circumstances of each particular case, and where there is any testimony reasonably tending to support its finding, it will not be disturbed on an application to vacate the award."

The employer cites no case indicating that the emergency, or non-emergency, nature of the surgery involved in such a situation would change the principles of law applied in the Spartan case, and we perceive no reason why it should.

■ From statements made by the trial judge at the close of the hearing in the present case, when requesting briefs from both parties and providing for a supplemental statement by Dr. McC., it is apparent that the trial judge had in mind cases such as the Spartan case. And, since it is clear that the trial judge's denial of expenses theretofore incurred by the claimant for medical treatment and hospital services (affirmed by the State Industrial Court sitting en banc) was based upon the provisions of 85 O.S.1961, § 14 (which allows an injured workman to recover such ex-

penses in event of emergency treatment, but does not mention compensation for disability) and a finding that no emergency treatment was involved, it is only logical to assume that the trial judge did not consider that the supplemental statement by Dr. McC.—either by itself or in combination with evidence adduced at the hearing—was sufficient evidence to support a finding that any of the treatment and services obtained from Dr. McC. or Dr. W. or the Oklahoma Osteopathic Hospital was of an emergency nature. The employer's second proposition cannot be sustained.

■ The express findings of the trial judge (affirmed by the State Industrial Court sitting en banc) that the claimant sustained an accidental personal injury, arising out of and in the course of his employment with this employer, consisting of an injury to his back, and that, as a result of said injury, the claimant has been temporarily totally disabled, from the date of the injury to the date of the hearing, and is still temporarily totally disabled and in need of further medical treatment, care, and attention, constituted specific findings of the ultimate facts concerning the issue raised by the workman's claim, and the employer's third defense thereto, and the evidence with respect thereto. Unless the employer's first proposition be sustained, there was competent evidence reasonably tending to support these findings and the award based thereon.

■ The employer's first proposition is that the award must be vacated because it is based upon medical opinion which is based upon an erroneous history. The argument is to the effect that, because the award could only be based upon the first statement by Dr. McC., which shows that he was under the impression that the claimant had fallen ten feet from a ladder and landed flat on his back, but the claimant testified positively that he had not fallen from a ladder but had fallen on his back from a crouching or squatting position on the ground, there is no competent medical evidence to sustain the award.

In support of this proposition, the employer cites Acme Flour Mills et al. v. Bray et al. (1939), 185 Okl. 516, 94 P.2d 828, Western Good Roads Service Co. et al. v. Coombes et al. (1939), 185 Okl. 599, 95 P.2d 633, and Glaspey et al. v. Dickerson et al. (1960), Okl. 350 P.2d 939, and quotes the court's syllabus to the Acme Flour Mills case:

"Testimony of an expert witness based upon a history admittedly incomplete and inaccurate has no probative value.

"Where an award of the State Industrial Commission [now Court] is based upon material findings of fact which are unsupported by any competent evidence, this court, on review, will vacate such award as a matter of law."

The holding against the award in the Western Good Roads case is, clearly, bottomed upon the proposition that before there can be a disability covered by the Workmen's Compensation Law, there must be an "accidental injury"—in other words, unless there is competent evidence that the claimant's disability is the result of an accidental injury, the disability is not compensable under the Workmen's Compensation Law.

The testimony in that case, and in the Acme Flour Mills case, disclosed that, unknown to the medical expert whose opinion was the basis for the award, the physical condition that caused the claimant's disability was in existence at the time of the incident relied upon by the claimant as the "accident" that resulted in his injury and disability, so that his opinion, being based upon the incident only, with no consideration being given to the pre-existing physical condition involved, had no probative value. In the Glaspey case, which involved death from a heart attack, there was a complete lack of medical testimony that the workman's heart attack was the result of anything that he had done in the performance of his job, so that there was no competent evidence that the heart attack was an "accidental injury" within the contemplation of the Workmen's Compensation Law.

In the present case, there is medical evidence (even without the statement by Dr. McC.) that this claimant sustained some injury to his back as the result of an accidental fall on his back while performing his job; and, although in his statement Dr. McC. stated a "history" that was not 100 per cent correct, the incorrectness was only with respect to how far the claimant had fallen. The cases cited by the employer are not in point, and its first proposition must be denied.

It is the judgment and order of this court that the order of the State Industrial Court, affirming the order of the trial judge herein, should be, and hereby is, sustained.

All the Justices concur.